45 F.3d 427
NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
 B. Michael SMITH, Plaintiff-Appellant,
v.
CONNECTICUT MUTUAL LIFE INSURANCE COMPANY, Defendant-Appellee,
v.
R. Dean RAMEY, Third Party Defendant.
 No. 94-1503.
 United States Court of Appeals, Fourth Circuit.
 Argued Dec. 7, 1994.
Decided Jan. 10, 1995.
 
 Appeal from the United States District Court for the Eastern District of North Carolina, at Raleigh. Alexander B. Denson, Magistrate Judge. (CA-93-45-5-CIV-H).
 ARGUED: John Walter Bryant, BASS, BRYANT & MOORE, Raleigh, NC, for Appellant. A. Bailey Nager, MOORE & VAN ALLEN, P.L.L.C., Raleigh, NC, for Appellee. ON BRIEF: William E. Moore, BASS, BRYANT & MOORE, Raleigh, NC, for Appellant. Joseph W. Eason, MOORE & VAN ALLEN, P.L.L.C., Raleigh, NC, for Appellee.
 E.D.N.C.
 AFFIRMED.
 Before HALL and LUTTIG, Circuit Judges, and CURRIE, United States District Judge for the District of South Carolina, sitting by designation.
 OPINION
 PER CURIAM:
 
 
 1
 Dr. Michael Smith appeals an order of the magistrate, sitting by consent, granting defendant Connecticut Mutual Life Insurance Company's motion for summary judgment in an insurance coverage dispute. Smith also appeals the district court's order denying his motion to withdraw his consent to referral to the magistrate. We affirm.
 
 I.
 
 2
 Michael Smith is a surgeon in Henderson, North Carolina. He had been in practice with another surgeon, Dr. Michael Tyner, but Tyner resigned and relocated in July, 1992. His new status as sole income generator for his practice worried Dr. Smith, because he might not be able to keep up with business overhead if he were temporarily disabled. In the late summer, he called Dean Ramey, an insurance broker, and asked him to procure Business Overhead Expense disability insurance. Smith's office manager provided Ramey with specifics on September 1, 1992, the only pertinent one of which was the amount of coverage Smith desired: $25,000 per month.
 
 
 3
 On September 3, Ramey met with Smith and showed him proposals from three different companies. Connecticut Mutual's proposal had been prepared by Dave Armstrong, a Connecticut Mutual general agent, and forwarded to Ramey. As he had with several companies, Ramey had a brokerage agreement with Connecticut Mutual, which authorized him to find customers for the company's products but which did not invest him with any authority to bind the company.
 
 
 4
 Smith picked Connecticut Mutual, filled out the application, and asked Ramey to secure coverage as soon as possible. Ramey signed the application as "Soliciting Agent" and "Licensed/Agent." No premium was paid at this time.
 
 
 5
 Connecticut Mutual required a physical for the coverage, and, on September 18, Smith's personal physician, Dr. Franklin Mills, examined him and found him to be healthy. Dr. Mills did not, however, immediately send the required "attending physician's statement" to Connecticut Mutual. In ensuing conversations with Ramey, Smith emphasized that he wanted to bind coverage as soon as possible, and Ramey relayed this information to Armstrong.
 
 
 6
 On September 23, Smith's office manager called Ramey again to inquire about getting coverage as soon as possible. Ramey called Armstrong to ask what he and Smith needed to do to "bind coverage." Armstrong advised Ramey to have Smith fill out a new application and a binder (the "Conditional Advance Premium Receipt") and to collect a check for the first quarterly premium. All three of these documents had to bear the same date, and the binder and application had to have the same policy number, which explains why Smith needed to complete a new application.
 
 
 7
 On September 25, Smith and Ramey met at Smith's office and filled out the application. Smith meanwhile had discovered that another company had coverage at a better cost, but he decided to go ahead with the Connecticut Mutual policy rather than start the process over. Smith tendered the premium and signed the binder. This entire meeting had lasted only fifteen minutes, because Smith was in a hurry. Ramey made a phone call to Armstrong and then went to find Smith, who was robed to see his next patient. Smith said, "Am I covered?" Ramey replied, "Yes."
 
 
 8
 In neither the September 23 nor 25 phone conversations between Ramey and Armstrong did Armstrong make any representation about the contents of the binder. Ramey believed when he told Smith that he was "covered" that the full $25,000 policy was in immediate effect, though he did not read the binder.
 
 
 9
 Five days later, Smith badly burned his hands in a boating accident. He was unable to perform surgery until May, 1993. Connecticut Mutual refused to issue the $25,000 per month policy, but did pay $3,000 per month under the terms of the binder until Smith was back to work.
 
 
 10
 Smith filed this suit in state court against Connecticut Mutual. He pled claims for breach of contract, estoppel, fraud, and violation of North Carolina's unfair trade practices statute. Connecticut Mutual removed the case to district court and filed a third-party complaint, seeking indemnity and contribution, against Ramey. After discovery, Smith and Connecticut Mutual filed competing motions for summary judgment, which the district court referred to a magistrate for a report and recommendation. 28 U.S.C. Sec. 636(b)(1)(B).
 
 
 11
 In late January, 1994, the parties were trying to work out a trial date. Because of scheduling conflicts, a trial before Judge Howard could not be set before fall. Connecticut Mutual proposed that Smith consent to proceed before the magistrate. Smith agreed. On the very day the consent was filed, January 31, 1994, Smith received the magistrate's report and recommendation in the mail. In a memorandum dated January 28, the magistrate recommended granting summary judgment for Connecticut Mutual.
 
 
 12
 Realizing that this same magistrate now had the power to enter judgment on his own recommendation, Smith moved to withdraw his consent. The district court denied the motion, and the magistrate entered final judgment for Connecticut Mutual.
 
 
 13
 Smith appeals.
 
 II.
 
 14
 Smith argues that the district court abused its discretion in not permitting him to withdraw his consent to the referral of the case to the magistrate. Where a party has given his consent to a referral, the dis trict court may vacate the referral on that party's motion only "under extraordinary circumstances." 28 U.S.C. Sec. 636(c)(6); Fed.R.Civ.P. 73(b). This is a threshold issue, because resolution of it in Smith's favor would compel vacating the summary judgment. The consent of the parties is essential to the constitutionality of referrals under Sec. 636(c) of the Federal Magistrate Act. See Gairola v. Dep't of General Services, 753 F.2d 1281, 1285 (4th Cir.1985).
 
 
 15
 The district court certainly did not abuse its discretion in finding no "extraordinary circumstances" here. Smith argues that he had only intended to consent to a trial before the magistrate, and not to disposition on summary judgment. The plain language of the consent sinks this argument. The parties agreed that the magistrate could "conduct any and all further proceedings in the case." Smith knew that the parties' summary judgment motions were outstanding when he agreed to the order, and his dissatisfaction with the magistrate's resolution of those motions is not an "extraordinary circumstance." Indeed, in almost every case that has been referred by consent, one party or the other will be dissatisfied with the ultimate result. The district court did not err in denying Smith's motion. We therefore turn to the merits of the summary judgment.
 
 III.
 
 16
 The parties' only written contract is the binder, and, under the parol evidence rule, extraneous evidence may not vary its terms. Spartan Leasing Inc. v. Pollard, 101 N.C.App. 450, 400 S.E.2d 476, 480 (1991). Parol evidence can be used to clarify ambiguous terms in a written contract, though the parol evidence cannot be relied on to create the ambiguity, and it must illustrate mutual, rather than unilateral, intent. Brown v. Scism, 50 N.C.App. 619, 274 S.E.2d 897, 899-900 (1981). Smith asserts that the binder is ambiguous, and that Ramey's statement that Smith was "covered" created a contractual obligation for Smith's principal, Connecticut Mutual. Smith is wrong on both counts.
 
 
 17
 First of all, Ramey is an insurance broker, not a Connecticut Mutual general agent. For sure, Ramey performed certain "agency" functions for Connecticut Mutual, but he also did so for Smith. Smith called Ramey and requested that Ramey find a suitable policy for him.
 
 
 18
 For its part, Connecticut Mutual had authorized Ramey to procure customers. Smith asserts that it is a triable issue of fact whether Ramey was his or Connecticut Mutual's agent.
 
 
 19
 If common-law agency principles applied here, Smith might be correct. But they do not. Rather than permit a broker's hybrid status to create multitudes of spurious parol insurance contracts, North Carolina has a statutory bright-line rule. The broker is the insurance company's agent only for purposes of accepting the initial premium on issuance of the contract. For all other purposes, in any controversy between insurer and insured, the broker is considered the insured's agent. N.C. Gen.Stat. Sec. 58-33-20(b). Therefore, Ramey's statements could not bind Connecticut Mutual.
 
 
 20
 Moreover, there is no ambiguity in the binder sufficient to invoke the exception to the parol evidence rule. Indeed, as insurance policies go, this one-page document is painfully clear. The key provisions are C, E, and the closing paragraph:
 
 
 21
 C. COVERAGE SHALL BE LIMITED TO THE LESSER OF:
 
 
 22
 1. The actual amount of insurance applied for, or
 
 
 23
 2. $3,000 per month of disability income benefits....
 
 
 24
 E. WE PROMISE TO ISSUE a base policy with no extra benefits riders, to a Proposed Insured who is a standard risk as of the Underwriting Date.[1] For limited amounts of insurance, we will ignore changes of insurability that occur after that date. The limit is $3,000 per month with a benefit period of five years or less. For amounts over this limit, we will base our decision to issue on all evidence of insurability including changes that first occur after the Underwriting Date....
 
 
 25
 THIS RECEIPT PROVIDES A LIMITED AMOUNT OF INSURANCE PROTECTION UNDER THE TERMS OF THE APPLIED FOR POLICY FOR A LIMITED PERIOD OF TIME. I HAVE RECEIVED THE ORIGINAL OF THIS RECEIPT AND HAVE READ IT CAREFULLY.
 
 
 26
 At his deposition, Dr. Smith could not remember whether he read the binder before signing it, but said that he usually does read such things. Ramey flatly admitted that he did not read it. Ordinarily, a person cannot complain about being misled by a document he did not even read. Setzer v. Old Republic Life Ins. Co., 257 N.C. 396, 126 S.E.2d 135, 139 (1962). In any event, we just do not see any ambiguity. The contract says that Connecticut Mutual will pay $3,000 a month, and that is what it paid. It clearly reserved the right to decline to issue the $25,000 policy if Smith's insurability changed after the Underwriting Date.
 
 
 27
 Finally, it is of no consequence that Armstrong did not alert Ramey or Smith to the terms and limitations of the binder. A corollary of the insured's duty to read the policy is that the insurer has no duty to warn the insured about its provisions. Nationwide Mutual Ins. Co. v. Edwards, 67 N.C.App. 1, 312 S.E.2d 656, 661 (1984).
 
 IV.
 
 28
 Smith's various tort theories fall on much the same reasoning. Both fraud and estoppel would require a showing of a material misrepresentation by Connecticut Mutual on which Dr. Smith reasonably relied to his detriment. Ramey was not Connecticut Mutual's agent, so he cannot provide the "misrepresentation." Armstrong, of course, was Connecticut Mutual's agent, but his instructions concerning how to "bind" coverage were entirely accurate, and, as we noted above, he had no duty to warn Smith of the binder's plain terms.
 
 
 29
 Even if Ramey were an agent of the insurer, Smith would have to have reasonably relied on the statements. The binder is clearly at odds with what Smith says he believed. Had he read it carefully, Smith could not have believed that he had $25,000 a month of insurance from day one. The binder is not dense or prolix,[2] and Smith is well-educated.[3] We do not think Smith's reliance on Ramey's representations about the binder was reasonable. Spartan Leasing, 400 S.E.2d at 479-480, has very similar facts[4] and controls on this point.
 
 
 30
 Finally, Smith argues that Connecticut Mutual engaged in an unfair and deceptive trade practice by representing that he was fully "covered." Again, Ramey's statements are not Connecticut Mutual's. The language of the binder is clear.
 
 
 31
 The judgment is affirmed.
 
 
 32
 AFFIRMED.
 
 
 
 [1]
 The "Underwriting Date" is the day on which the application and physical exam have both been completed--September 25 in this case
 
 
 [2]
 See Setzer, 126 S.E.2d at 139 (insured had duty to read 43-line, one-page document)
 
 
 [3]
 Compare Mills v. Lynch, 259 N.C. 359, 130 S.E.2d 541 (1963) (duty to read not controlling if fraud perpetrated on an illiterate person)
 
 
 [4]
 In Spartan Leasing, the guarantor under a written agreement argued that he had been misled and had not intended to be a guarantor. The court noted that the guarantor was neither unable to nor prevented from reading the document, which was a single page labeled "GUARANTY" in large bold letters. The court therefore held that the guarantor's reliance on alleged oral representations was not reasonable